Bobby Whittle was convicted of murder and sentenced to ninety-nine years in the penitentiary. On appeal, he claims that he was erroneously denied the assistance of a psychiatric expert and that his statements were inadmissible.
 I
Following a defense motion for a psychiatric evaluation, the trial court ordered that the defendant be examined, prior to trial, at Taylor Hardin Secure Medical Facility in Tuscaloosa. As a result of the psychiatric evaluation, the defendant was found competent to stand trial and sane at the time of the offense. Under the circumstances, neither § 15-12-21, Code of Alabama 1975, nor Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087,84 L.Ed.2d 53 (1985), guarantees the defendant the further assistance of a psychiatric expert at state expense.
Although § 15-12-21(d) authorizes payment of court-approved expenses, "[t]he trial judge must find some reasonable basis for the expenditure of state funds before he may authorize" payment under the statute, Wiggins v. State, 440 So.2d 1164,1167 (Ala.Cr.App. 1983) (emphasis added). Once the defendant has been found competent to stand trial and sane at the time of the offense, the trial court's conclusion that there is no "reasonable basis" for further state-authorized psychiatric expenses is proper. See Whisenhant v. State, 482 So.2d 1225,1229 (Ala.Cr.App. 1982), aff'd in part and remanded in part, Exparte Whisenhant, 482 So.2d 1241 (Ala. 1983), on remand,Whisenhant v. State, 482 So.2d 1246 (Ala.Cr.App. 1983), reversed on other grounds, Ex parte Whisenhant, 482 So.2d 1247
(Ala. 1984). "Common sense, as well as sound legal authority, dictates that the trial judge not grant a psychiatric examination at state expense unless there is some reason to believe the accused was incompetent or insane." Bailey v.State, 421 So.2d 1364, 1367 (Ala.Cr.App. 1982).
The Supreme Court's holding in Ake does not alter the result here. In Ake, the accused was ordered to undergo a pre-trial competency evaluation, but no examination was ever conducted to determine his criminal responsibility for the charged offense. "During Ake's 3-month stay at the state hospital, no inquiry had been made into his sanity at the time of the offense, and, as an indigent, Ake could not afford to pay for a psychiatrist." Ake, 470 U.S. at 72, 105 S.Ct. at 1091. The Supreme Court held that because Ake had made a threshold showing that his sanity at the time of the offense was likely to be a significant issue at trial, and because Ake had never had an evaluation to determine his sanity at the time of the offense, he was denied due process of law. Ake, 470 U.S. at 74,105 S.Ct. at 1092. The defendant in the present case was evaluated by a psychiatrist on the issues of competency to stand trial and ultimate criminal responsibility. Ake does not guarantee him anything more. An indigent defendant does not have "a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own," Ake,470 U.S. at 83, 105 S.Ct. at 1097; Isom v. State, 488 So.2d 12, 13
(Ala.Cr.App. 1986).
 II
The defendant was first advised of his Miranda rights in the early morning hours *Page 795 
of December 8, 1985. He signed a waiver of rights form and stated in essence that he and the victim got into a fight with a knife and that he killed the victim in self-defense. Later that day, the defendant was again advised of hisMiranda rights, signed a waiver form, and gave another statement which was substantially similar to the first.
On December 21, 1985, after the defendant had been incarcerated in the county jail almost two weeks, he sent word
by a jailer that he wanted to talk to Sheriff Whittle, who was his first cousin. The defendant was brought from his cell to the sheriff's "living quarters" at the jail and, as shown by a transcribed tape recording of the conversation that occurred, the following then transpired:
 "Doug [Sheriff Whittle]: All right, today's date will be December the 21st, 1985. The time is 10:05 P.M. I'm Doug Whittle of the Sheriff's Office in Geneva County. One of the jailers delivered word to me about an hour ago that a subject here in the county jail by the name of Bobby Whittle wished to talk to me at this time, so I've just gone back and got Bobby out of his cell and we've come in the living quarters, no one present but myself and Bobby in the living quarters at the jail and Bobby said that he wished to talk to me about this case, so before Bobby talked to me, I wanted to read him his constitutional rights and then let him talk, whatever he. . . . . . . . Now Bobby, you realize that you have the right to talk to a lawyer and have him with you while you are being questioned. If you want a lawyer and cannot afford one, the court will appoint one for you. If you wish to waive that right and talk to me at this time, any time you desire, you can stop and have a lawyer appointed for you. Do you understand these constitutional rights?
"Bobby [Defendant]: Yes sir.
 "Doug: Now each and every time that we've talked to you before, we've had to sign a waiver of rights didn't we?
"Bobby: Yes sir.
"Doug: Are you familiar with all of your rights?
"Bobby: Yes sir.
 "Doug: All right, at this time I'm gonna turn it over to you. You said you wanted to talk, you just talk to me about this case, now."
Thereupon followed an uninterrupted narration by the defendant of the events culminating in the death of the victim. The defendant's narrative related, in essence, that he "went out of [his] head, . . . walked to the kitchen and got the big butcher knife and . . . went back into the bedroom and proceeded to stab [the victim]." This version of the victim's death omitted any claim of self-defense. When the defendant had completed his narrative, the sheriff questioned him about details of the occurrence and played back the tape recording for the defendant. Upon hearing the tape, the defendant clarified or corrected several factual details and responded to the following questions by the sheriff:
 "[Sheriff]: All right, Bobby, still keeping in mind now of your constitutional rights that I read to you to start off with before we ever started this taping, is this a true story?
"[Defendant]: Yes sir. I've lied enough about it.
". . . .
 "[Sheriff]: OK. . . . Is there anything else you want to add or change or say?
"[Defendant]: No sir.
"[Sheriff]: All right.
"[Defendant]: You can't change the truth."
The defendant claims that all three of his statements were inadmissible due to ineffective waivers of his right against self-incrimination. He maintains that the waivers given for the two December 8th statements were not knowing and intelligent due to his intoxication and mental retardation. He claims that the waiver preceding the December 21st statement was invalid because he had not been properly informed of hisMiranda rights, and because he was influenced by his familial relationship with the sheriff. *Page 796 
 A
The defendant testified that he had been drinking heavily on the day the victim was killed. He said that he took a number of nerve pills or sleeping pills after the incident and did not remember giving any statements after his arrest on December 8th. He was taken into custody about 4:00 a.m. and he made statements at 4:45 a.m. and 9:45 a.m. As this court observed inMusgrove v. State, 519 So.2d 565 (Ala.Cr.App. 1986), "If the testimony of the defendant . . . is accepted as true, the defendant could not have knowingly and intelligently waived hisMiranda rights," 519 So.2d at 576. As we also observed inMusgrove and as is the case here, "However, several police officers testified that the defendant was not intoxicated from either alcohol or drugs," 519 So.2d at 576. Sheriff Whittle testified, "Well, you could smell alcohol, but so far as him being in a drunken manner, no, sir. He was very capable of moving around when he wanted to and he could talk with a good level head. He made complete sentences and he didn't stammer or talk thick-tongued.
 "The standards for appellate review of a trial judge's determination of the admissibility of a confession were enumerated in Williams v. State, 461 So.2d 834, 838 (Ala.Cr.App. 1983), reversed on other grounds, Ex parte Williams, 461 So.2d 852
(Ala. 1984):
 " '(1) The test for voluntariness involves a consideration of the totality of the circumstances. Haynes v. Washington, 373 U.S. 503, 513-14, 83 S.Ct. 1336, 1342-43, 10 L.Ed.2d 513 (1963). (2) "The admissibility of confessions is for the court, their credibility is for the jury." Phillips v. State, 248 Ala. 510, 520, 28 So.2d 542 (1946). (3) Where the voluntariness inquiry presents conflicting evidence and the trial judge finds that the confession was voluntarily made, great weight must be given his judgment. "(W)here there is a genuine conflict of evidence great reliance must be placed upon the finder of fact." Blackburn v. Alabama, 361 U.S. 199, 208, 80 S.Ct. 274, 281, 4 L.Ed.2d 242
(1960). (4) This finding will not be disturbed on appeal unless the appellate court is convinced that the conclusion is palpably contrary to the great weight of the evidence and manifestly wrong. Harris v. State, 280 Ala. 468, 470-71, 195 So.2d 521 (1967). (5) Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial court need only be supported by substantial evidence and not to a moral certainty. Thompson v. State, 347 So.2d 1371, 1375 (Ala.Cr.App.), cert. denied, 347 So.2d 1377 (Ala. 1977), and cases cited therein. "Review of the court's action is limited to determining whether its finding was clearly erroneous." United States v. Greer, 566 F.2d 472, 473 (5th Cir. 1978).' "
Musgrove v. State, 519 So.2d at 576.
Applying the principles set out in Williams, supra, andMusgrove, supra, to the facts of this case, we find that the defendant's statements on December 8th were voluntary, based on knowing and intelligent waivers of his rights, and were properly admitted into evidence.
 B
Although the defendant also claims that his statements were inadmissible because of his emotional instability and mental subnormality, there was no evidence presented prior to the introduction of the statements to indicate that he suffered from any emotional problems or mental deficiency. Although the defendant presented testimony, after the state had rested, that he fell within the "slow learner to high-mentally retarded category of the special education students" at school, that "his functional literacy rate was very, very low," and that he had experienced "some very serious emotional conflicts" as a child, there was no evidence presented during the in camera hearing on the motion to suppress his statements that he was mentally impaired. Moreover, a defendant's mental *Page 797 
impairment, even if it exists, is merely one factor affecting the validity of his waiver of rights and the voluntariness of his confession. See generally Annot., 8 A.L.R. 4th 16 (1981). "While an accused's intelligence and literacy are important factors to be considered in determining whether he intelligently and voluntarily waived his constitutional rights and made a confession, weak intellect or illiteracy alone will not render a confession inadmissible." Hobbs v. State,401 So.2d 276, 282 (Ala.Cr.App. 1981).
Here, the state made a prima facie showing that the waivers preceding all three of the defendant's statements were knowing and intelligent. The sheriff testified that before each statement the defendant appeared to understand his rights and, in fact, stated that he understood his rights and signed waiver forms for two of the statements. Even considering evidence of the defendant's mental subnormality which was not before the trial judge when he ruled on the admissibility of the statements, the defense testimony "does not show that [the defendant] was so mentally deficient that he was incapable of being able to make a knowing and intelligent waiver."Sasser v. State, 497 So.2d 1131, 1134 (Ala.Cr.App. 1986).
 C
Prior to the December 21st tape-recorded statement, Sheriff Whittle informed the defendant that he had the right to a lawyer and, if he could not afford a lawyer, one would be appointed for him. He did not advise the defendant that he had the right to remain silent and that anything he said could be used against him. The omission of the foregoing rights mandated in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966), constituted a clearly defective warning to the defendant, Cf. Lowe v. State, 408 So.2d 201 (Ala.Cr.App. 1981) (Miranda warnings defective for failure to advise of right to appointed attorney). We need not decide to what extent the earlier (December 8th) warnings and waivers were still in effect, cf. Allen v. State, 53 Ala. App. 66, 71, 297 So.2d 391, cert. denied, 292 Ala. 707, 297 So.2d 399 (1974) (three weeks' delay "deprive[d] the warnings and waiver of their previous efficacy"), because we conclude that no Miranda warnings were necessary under the circumstances.
"[B]efore the [Miranda] warnings need be given, it must be established that the subject was both 'in custody' and under 'interrogation' by police officers." United States v. Castro,723 F.2d 1527, 1530 (11th Cir. 1984). See Smith, "The ThresholdQuestion in Applying Miranda: What Constitutes CustodialInterrogation?" 25 S.C.L.Rev. 699, 702 (1974). Here the defendant was clearly in custody. However, not all "statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation."Rhode Island v. Innis, 446 U.S. 291, 299, 100 S.Ct. 1682, 1689,64 L.Ed.2d 297 (1980). The Supreme Court defined "interrogation" in Miranda as "questioning initiated by law enforcement officers," 384 U.S. at 444, 86 S.Ct. at 1612, and pointed out that "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." 384 U.S. at 478,86 S.Ct. at 1630. See generally, Annot. 31 A.L.R.3d 565 (1970). A volunteered statement, made without any attempt by peace officers to solicit it, is not deemed to be the product of custodial interrogation, even though an individual may be in the most severe form of custody. United States v. Littlejohn,441 F.2d 26, 27-28 (10th Cir. 1971).
 "The mere existence of custody alone, however, does not necessarily give, rise to . . . inherent psychological pressures. Thus, the 'spontaneous' or 'volunteered' confession of a suspect in custody is admissible despite the absence of prior Miranda warnings. As the Court stated in Innis, '[i]nterrogation,' as conceptualized in the Miranda
opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.' " United States v. Booth, 669 F.2d 1231, 1237, appeal after remand sub nom. United States v. Kessler, 692 F.2d 584 (9th Cir. *Page 798 
1981) (quoting Rhode Island v. Innis, 446 U.S. at 300, 100 S.Ct. at 1689) (citations omitted).
In the present case, the defendant's December 21st confession to Sheriff Whittle resulted from the defendant's own request to talk to the sheriff and was not prompted by any initial questioning on the part of the law enforcement officer. It was not the product of a compelling atmosphere, was not extracted by psychological pressures on the defendant, was not attended by any real or supposed police abuses, and, most importantly, it was at the defendant's own insistence. The confession, therefore, falls within the "volunteered statement" exception to Miranda. See, e.g., Smith v. Peyton, 295 F. Supp. 1379
(W.D.Va. 1968); Biglow v. State, 205 So.2d 547 (Fla.App. 1967);King v. State, 5 Md. App. 652, 249 A.2d 468 (1969); Johnson v.State, 448 P.2d 266 (Okla.Crim.App. 1968), cert. denied,397 U.S. 941, 90 S.Ct. 953, 25 L.Ed.2d 121 (1970). We conclude, as the Maryland Court of Appeals observed in a case with similar facts, that "Even though the appellant was 'in custody' . . . we do not believe that the challenged statement was obtained under circumstances likely to affect substantially the appellant's will to resist and compelled him to speak where he would not otherwise have done so freely. . . . The dangersMiranda intended to guard against were here not present." Kingv. State, 5 Md. App. at 672, 249 A.2d at 481 (citation omitted). also Smith, "The Threshold Question in ApplyingMiranda: What Constitutes Custodial Interrogation?" 25 S.C.L.Rev. at 700-702.
Sheriff Whittle did not interrupt, by question or comment, the defendant's initial narrative of the events resulting in the victim's death, but he did question the defendant at the conclusion of his incriminating story. Although the questions related to rather insignificant details and appeared to be "for the purpose of clarifying certain points made by the defendant," see State v. Archible, 25 N.C. App. 95,212 S.E.2d 44, 46 (1975), we recognize that because the questions were "reasonably likely to elicit an incriminating response," RhodeIsland v. Innis, 446 U.S. at 301-02, 100 S.Ct. at 1689-90, they constituted interrogation. We find, nevertheless, that because the defendant had already completely incriminated himself by the time he had finished his volunteered and uninterrupted narrative, that any error of admitting defendant's answers to Sheriff Whittle's follow-up questions was harmless. A.R.A.P. 45.
 D
The defendant's final claim, that of his relationship with his first cousin Sheriff Whittle, constituted some sort of improper "persuasion" or inducement for his confession, is completely unsupported by the record. The transcribed tape recording of the defendant's December 21st confession includes his statement that it was made without any threat, promise, or prior discussion with the sheriff. At trial, the defendant testified, "The only reason I talked to him is because I thought — I figured that he was family and he would sit down and listen and try to understand." Immediately thereafter, he also acknowledged that he knew his statement to Sheriff Whittle was being tape-recorded and "the world would listen to it." Sheriff Whittle testified at trial that, although he and the defendant were related, their families had not exchanged visits over the years and he and the defendant had never been close to each other.
In our judgment, the defendant did not present any evidence of improper influence, persuasion, or inducement because of his kinship with the Sheriff. If anything, the defendant's statement, "I figured that he was family and he would sit down and listen and try to understand," indicates the lack of coercion attending the defendant's decision to confess. CompareIn re Orr, 38 Ill.2d 417, 424, 231 N.E.2d 424 (1967), cert. denied, 391 U.S. 924, 88 S.Ct. 1821, 20 L.Ed.2d 663 (1968) (juvenile's statement to two officers whom he considered friends "was the product of a compulsive conscience or otherwise psychologically motivated rather than the result of a coercive atmosphere"). *Page 799 
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.