Christopher Demos was originally indicted at the October 1975 term of the Grand Jury for "unlawfully and with malice aforethought" killing Edna Raquel Demos. A Baldwin County petit jury, on November 13, 1975, found this appellant guilty of murder in the first degree. Ala. Code tit. 14 § 314 (1940). The trial judge sentenced the appellant to life imprisonment in the state penitentiary.
The appellant thereafter appealed to this court, and the judgment was affirmed. Demos v. State, 57 Ala. App. 588,329 So.2d 646 (1976). A petition for certiorari was not filed with the Alabama Supreme Court.
Then, on July 1, 1981, the appellant filed a petition for writ of error coram nobis with the Baldwin County Circuit Court. The trial judge denied the writ. This court, without opinion, affirmed, Demos v. State, 428 So.2d 1375 (Ala.Cr.App. 1983), and the Alabama Supreme Court denied certiorari.
On October 12, 1983, the appellant filed a petition for a writ of habeas corpus with the United States District Court, Southern District of Alabama. That court, on September 18, 1986, ordered the appellant released from custody or retried. The State appealed to the Eleventh Circuit Court of Appeals. The Eleventh Circuit affirmed, in pertinent part, on the grounds "that the trial court should have conducted aPate hearing [Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836,15 L.Ed.2d 815 (1966)] on petitioner's competency to stand trial."Demos v. Johnson, 835 F.2d 840 (11th Cir.), cert. denied,486 U.S. 1023, 108 S.Ct. 1998, 100 L.Ed.2d 229 (1988).
In August of 1988, almost thirteen years after his initial trial, this appellant was tried again in the Baldwin County Circuit Court. After the jury was unable to make a decision, the trial judge declared a mistrial.
A third trial of this appellant was commenced on October 3, 1988, in Baldwin County Circuit Court. The jury then found the appellant "guilty of Murder in the First Degree as charged in the indictment and fix[ed] his punishment at Life Imprisonment in the State Penitentiary." The appellant, by order of the trial judge, was sentenced accordingly.
The appellant now appeals from this latest judgment of conviction. Since he does not deny killing his ex-wife, Edna Raquel Demos, the facts involved will be briefly stated.
On August 21, 1975, the appellant picked up his ex-wife from her place of work in Pensacola, Florida. His 13-year-old stepdaughter was with him at the time. While at his wife's place of employment, he stole a knife. *Page 1171 
The three then went to the Intracoastal Waterway. The appellant and his ex-wife drank beer and inhaled Toulene, in the form of paint thinner or paint lacquer.
The trio then returned to their residence in Baldwin County. Upon entering the house, the appellant noticed his stereo was missing. He angrily jabbed the knife into a table, thinking one of his ex-wife's boyfriends took his stereo.
Within a short time thereafter, the three went to the bedroom and had sex. After his ex-wife and stepdaughter had dozed off, the appellant went into another room. He continued to inhale Toulene. He then picked up the knife, walked into the bedroom and stabbed his ex-wife. Testimony established that the victim died from the stab wound.
 I
The appellant contends that he was insane when he killed his ex-wife in 1975. Additionally, he claims that the trial court's refusal in 1975 to grant him psychiatric assistance makes a determination of his sanity at the time of the killing at issue impossible; thus, as a matter of law, he was irreparably harmed and cannot now adequately obtain a fair trial.
The crux of appellant's contentions relies on the United States Supreme Court's decision in Ake v. Oklahoma,470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Obviously, the appellant's 1975 conviction was pre-Ake, but the Eleventh Circuit's decision to grant the appellant a new trial was post-Ake. Therefore, we will follow what is the mandate of the United States Supreme Court and apply the principles of Ake.[1]
The United States Supreme Court in Ake stated that an indigent defendant must be provided with the tools necessary to properly defend himself. Ake, 470 U.S. at 77, 105 S.Ct. at 1093
("Meaningful access to justice. . . ."). "[F]undamental fairness entitles indigent defendants to 'an adequate opportunity to present their claims fairly within the adversary system.' " Id., quoting Ross v. Moffitt, 417 U.S. 600, 612,94 S.Ct. 2437, 2444, 41 L.Ed.2d 341 (1974).
Therefore, if the defendant is indigent and he claims as a "significant" part of his defense that he was insane at the time of the offense, he is entitled to a court-appointed psychiatrist, since the defendant carries the burden of proving his insanity. Ake, 470 U.S. at 82-83, 105 S.Ct. at 1096;Whisenhant v. State, 482 So.2d 1225, 1229 (Ala.Cr.App. 1982),aff'd in part, 482 So.2d 1241, 1244 (Ala. 1985).
The trial judges in both the first trial in 1975 and the two later trials in 1988 found the appellant to be indigent and appointed counsel to represent him. The appellant at all three trials pleaded not guilty and not guilty by reason of insanity.
The trial judge is the "proper screening agent" to determine whether the accused is entitled to psychiatric assistance in preparing his defense. See Ala. Code § 15-12-21 (1975) (Supp. 1988); Whittle v. State, 518 So.2d 793, 794 (Ala.Cr.App. 1987);Nelson v. State, 511 So.2d 225, 236-37 (Ala.Cr.App. 1986),aff'd, 511 So.2d 248 (Ala. 1987); Whisenhant. If the trial judge determines that an accused is entitled to court-appointed psychiatric evaluation, the judge need only to transfer the accused to a qualified counselor. Due process does not require that the counselor be an independent, private counselor. Referring the accused to a state facility for evaluation will suffice. See Finney v. Zant, 709 F.2d 643, 645 (11th Cir. 1983); Magwood v. State, 426 So.2d 918 (Ala.Cr.App. 1982),aff'd, 426 So.2d 929 (Ala. 1983).
In Whittle, the appellant was sent to the Taylor Hardin Secure Medical Facility (Taylor Hardin) in Tuscaloosa, Alabama, to determine *Page 1172 
if he was competent to stand trial and to determine if he was sane at the time of the offense. The psychiatric evaluation revealed that he was both competent to stand trial and sane at the time of the offense at issue. Whittle, 518 So.2d at 794.
In the case sub judice, this appellant was also sent to Taylor Hardin. On July 20, 1988, Dr. Beverly Denise Bell of that facility interviewed the appellant and determined that he was competent to stand trial. Dr. Bell could not, however, determine if he was sane at the time of the offense since the appellant, at the direction of his attorney, refused to answer questions about his actions at the time of the killing.
The appellant, in fact, challenged this evaluation, and the trial judge allowed a second independent psychiatrist, Dr. C. Van Rosen, to interview the appellant to determine if he was sane at the time of the offense. Therefore, since the appellant waived his competency to stand trial and he was provided with ample evaluation to determine criminal responsibility, the guidelines of Ake were here followed. See Whittle, 518 So.2d at 794. In fact, the trial judge went beyond what is required by the laws of the State and by Ake.
We must now turn to the jury's verdict and determine whether it can stand in light of the evidence presented by the parties.
The appellant presented undisputed evidence that he was addicted to Toulene. He inhaled or sniffed this chemical from the time he was a teenager. He started by sniffing glue and later sniffed paint thinner and paint lacquer. By 1975, he had been sniffing Toulene for over ten years. By his own admission, the appellant had "a real strong craving for it." (R. 196.)
His parents took him to a psychiatrist when he was about 14 years old. The psychiatrist hospitalized him, but he continued to sniff Toulene. The appellant was also admitted to the Senanine House in both Michigan and California for drug rehabilitation.
The appellant's mother testified in his behalf and stated that her son had pushed her in 1971. She stated that the appellant would get "real spaced out when he was sniffing Toulene." (R. 179.) She felt that he had no control over his actions while he was under the influence of this substance and that it caused him to become "impulsive." (R. 179.) She further stated that during the year before the stabbing he was high about 90% of the time that she saw him.
Dr. Van Rosen, a clinical psychologist, also testified for the appellant. On cross-examination by the prosecutor, Dr. Van Rosen was asked how long it would take for someone who was high on Toulene to determine right from wrong. He responded as follows:
 "A That would depend on how much you did. It would depend on how long you were doing it. And I would expect after you quit doing it, probably a couple of hours, you would be back, all things being equal, you could tell right from wrong if you ever could." (R. 304)
On direct examination by appellant's counsel, Dr. Van Rosen testified that the appellant had a mental disorder, primarily that he was dependent on certain psychoactive drugs and that he had a personality disorder "with strong anti-social and borderline tendencies." (R. 271-72.) Dr. Van Rosen explained that people with these disorders tend to lack a conscience and oppose authority, generally starting at an early age. Further, such people have problems associating with others and exhibit impulse behavior at times. Dr. Van Rosen explained that people with these mental disorders can at times become psychotic and lose touch with reality. Dr. Van Rosen further testified as follows:
 "Q Doctor, you mentioned earlier the term psychosis or psychotic. Could you define that for the jury, please.
 "A This psychosis is a technical word which basically means that the person has a mental disorder of whatever kind that causes them to be out of contact with reality.
 "When I say out of contact with reality, I don't mean to say the person is completely out of touch with everything. *Page 1173 
 "As an example, most people that are very psychotic and if they were in a hospital room that caught fire, they would certainly know that the place is on fire and they'll leave.
 "Or they do not think a person is, for example, a wall. They won't try to walk through someone. They are out of touch with reality in some aspects.
 "This might make them to be, enough to be completely functioning in the regular world nonfunctional but they do know certain things.
 "Q Do you have an opinion as to whether Christopher Demos' underlying mental disorders that you have discussed, caused him to turn to these drugs such as Toulene?
"A Well, I think certainly it did.
 "Q Is there, is his underlying mental disorder something that he could have consciously chosen not to have?
 "A No, I don't believe you consciously can — I don't think you can consciously choose not to have a mental disorder. It's sort of like saying, when you are very depressed, and someone says, 'Have a nice day.'
 "You don't usually change your depression or very quickly change simply because somebody told you to have a nice day."
Dr. James Small, a criminalist with the State of Alabama, confirmed that Toulene can have disturbing effects on the human mind, possibly causing the person to lose touch with reality.
The appellant also took the stand and told of the events leading up to the offense of August 21, 1975. He stated that he sniffed Toulene for over ten years prior to the stabbing and had become addicted.
In 1974, he was arrested for the theft of an automobile, larceny by trick. Because of a probation violation, he served about one year in jail. During the time he was incarcerated, his wife, Edna Raquel Demos, advised him that she was living with another man. He obtained a divorce from her while he was in jail.
The appellant also stated that, while he was in jail, his infant child received head injuries and a short time later died. When he got out of jail, he moved back in with his ex-wife. After talking with his mother, the appellant learned that his ex-wife had lied to him about the child's death. When he approached his ex-wife, she continued to change her story about how the baby was injured and had died.
The appellant stated that moments before he stabbed his wife he was sniffing Toulene and thinking about the death of his child. He stated, "it just seemed at that time like God was telling me to go in there and kill her. I just walked in there and I stabbed her." The appellant testified that it was not uncommon for him to hear voices while under the influence of Toulene.
It is well-established in this State that a person is presumed sane. Insanity is an affirmative defense, and a defendant who raises it must prove "by a preponderance of the evidence and to the reasonable satisfaction of the jury,"Magwood, 426 So.2d at 921-22, that he was insane at the time of the offense. Magwood, 426 So.2d at 922. See also McKinnon v.State, 405 So.2d 78, 80 (Ala.Cr.App. 1981).
Whether the appellant was insane at the time he committed the offense is to be determined by the jury. The jury hears all testimony, including expert testimony, and can readily weigh such evidence as it sees fit. In fact, a jury may reject any or all expert testimony even though it is not contradicted.Magwood, 426 So.2d at 922 (but it may not arbitrarily ignore such testimony). See also Carr v. State, 518 So.2d 816, 818-19
(Ala.Cr.App. 1987).
While the appellant contends that his sanity, or lack thereof at the time of the murder, cannot now be determined because of the passage of time, he testified in detail on direct and cross-examination as to what he was thinking and feeling on the day on which he stabbed his ex-wife.
On direct examination, the appellant testified:
"Q Where was the knife? *Page 1174 
 "A Best I remember, best of my recollection, it was still stuck in the coffee table where I had stabbed it in the coffee table before.
"Q And what did you do after they went to sleep?
 "A I went back into the front room and I was doing lacquer thinner again. I was doing it the whole time.
 "Q Did you sniff the lacquer thinner while you were having sex?
"A Yes, sir, I did.
"Q So, go ahead. What did you do next?
 "A Well, I went back in the front room and sat down in the chair there. I was thinking about things and tripping out on this lacquer thinner.
 "I was sniffing it real good and I started thinking about my daughter. I started getting really upset and mad and kind of grieving, you know, I still didn't really know what happened to her.
 "I was not satisfied with the stories that I had gotten. It just seemed obvious to me that somebody killed my daughter. My wife wouldn't even tell me the truth about what happened to her.
 "So, I was sniffing lacquer thinner and it seemed at that time like God was telling me to go in there and kill her. I just walked in there and I stabbed her.
"And that's all I remember about that exactly.
". . . .
"Q Did you try to run, Chris?
"A No, sir.
 "Q Did you wash the blood off the knife or try to hide the knife?
 "A Well, I think I went and threw the knife in the kitchen sink. There was a bunch of dirty dishes in the sink. But there was no, you know, I don't remember there even being any blood on my hands.
 "She was laying under a blanket when I stabbed her. She had got under the blankets, you know. I remember that. I didn't have any blood. There was no blood to wash off."
On cross-examination of the appellant, he stated:
"Q You knew where to go get the knife?
 "A When I was sitting there, it was sticking in the table right in front of me. I could see it.
"Q Right. You knew where you were?
 "A If you had asked me at that time if I knew where I was, probably I knew I was in my own house.
 "Q My point is, that Mr. Biles said to you, you said to him, 'Sometimes I feel like I am on the moon.'
"A Okay.
 "Q And I believe you told Mr. Biles, the reason I was asking you, because you found the knife in a pretty good hurry, was that, 'God that told me to do it?'
"A Yes, sir, that's right.
"Q Well, what exactly did God tell you?
 "A I don't remember exactly. I don't know if I even heard a voice or was just kind of a silent voice, like. I mean, you know, it's been a long time for me, too.
 "I was sniffing that stuff then. Seemed like he was just telling me to go in there and kill her. That's what I felt.
 "Q Just seemed like God said to go in there and kill her?
"A Yes.
 "Q Could this voice have come to you later, after the knife? It's been thirteen years ago.
"A Could it have been?
 "Q Could this be a rationalization in your mind as to why you did it?
 "A I don't think it was. But it could have been. Could have been. It's possible. But I don't think that's what it was.
"Q Don't really know, do you?
 "A I am pretty sure that's what happened that night.
 "Q Don't really know. All right. Whatever. Now, when you got the knife, you walked into their bedroom, didn't you?
"A Yes.
 "Q And you walked directly to her. Or how did you get to her by the way?
"A I think I walked directly to her. *Page 1175 
 "Q Which hand did you have the knife in, Mr. Demos?
"A I think I had it in my right hand.
 "Q Just like the child showed, just like the fourteen year old child showed?
 "A If she said right hand, she was probably correct.
 "Q She was correct about you getting the knife over yonder, in Pensacola, too, wasn't she?
"A Yes.
"Q And you walked over to the bed, I presume?
"A (Nods head affirmatively.)
 "Q And you raised it, do you remember raising the knife, Mr. Demos?
"A Yes, pretty much, I do. I remember doing that.
"Q And then, you thrust it into her back?
"A That's right.
"Q Why did you kill her versus the child?
 "A This is something that I have thought about for thirteen years. You know, I feel like, you know, what happened to my daughter, and I was angry, I was angry to a point it was pure anger.
"Q Sure.
 "A And between this stuff working on my head, I don't know. I went in there and I stabbed her.
". . . .
 "Q Did you take any actions after you stabbed her through the back that would help her?
"A I don't even remember exactly what I did.
"Q You let her die?
"A I don't remember anything.
 "Q You didn't call the ambulance or anything like that?
 "A We didn't have a telephone. But when Deborah ran out of the house, I knew that's where she was going.
 "Q Oh, so, you had consciousness enough to know that Deborah was going to get help and get an ambulance?
 "A I remember when she ran out of the house. I felt like she was going to get help.
 "Q So, you knew that this woman that you had just stabbed needed help?
"A (Nods head affirmatively.)
 "Q When Deborah ran out of the house, you knew that or felt it?
"A Yes."
The appellant further testified that, when he pushed his mother in 1971, he was under the influence of Toulene. He knew this was wrong.
He testified that he knew sniffing Toulene was wrong, and that stealing a car, which he had done earlier in his life while high on Toulene, was also wrong.
Additionally, Dr. Bell was offered as a rebuttal witness by the State. Dr. Bell, while not having enough information to determine if the appellant was insane at the time of the offense, did contradict Dr. Van Rosen's classification of certain behavior of the appellant as being the result of a mental defect or disease.
While it is understood that psychiatry can be important in the determination of criminal culpability, perhaps the United States Supreme Court best summarized its import and role in our judicial system.
 "Psychiatry is not . . . an exact science, and psychiatrists disagree widely and frequently on what constitutes mental illness, on the appropriate diagnosis to be attached to given behavior and symptoms, or cure and treatment, and on likelihood of future dangerousness. Perhaps because there often is no single, accurate psychiatric conclusion on legal insanity in a given case, juries remain the primary fact finders on this issue, and they must resolve differences in opinion within the psychiatric profession on the basis of the evidence offered by each party."
Ake, 470 U.S. at 81, 105 S.Ct. at 1095.
The underlying test of insanity in this State is whether the accused "lacks substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law" as a result of a mental disease or defect. Ala. Code § 13A-3-1(a) (1975). At the time of this appellant's first trial, however, the test was *Page 1176 
whether, by reason of insanity, the appellant could "resist doing the wrong." Streeter v. State, 278 Ala. 272,177 So.2d 826, 828 (1965).
Regardless of the test applied, we hold that the evidence of insanity was conflicting and properly determined by the jury. "The evidence [in this cause] was not simply sufficient as a matter of law to overcome the presumption of sanity and to justify reversing the jury's verdict." Magwood, 426 So.2d at 923, citing Graham v. State, 383 So.2d 895 (Ala.Cr.App.), cert.denied, 383 So.2d 895 (Ala. 1980).
For the reasons stated, the judgment of the trial court is due to be, and it is hereby, affirmed.
AFFIRMED.
All the Judges concur.
[1] The Eleventh Circuit granted a new trial since it had not been determined in 1975 whether the appellant was competent to stand trial. The appellant, prior to his retrial, waived the question of competency to stand trial. He now claims that he was insane at the time of the killing and could not form the requisite intent to commit murder. While arguably the latter issue is not properly before this court, we will address this matter since the trial court addressed the appellant's contention and granted the appellant access to a court-appointed psychiatrist for such a determination.