Steven Earl Cleckler was indicted for capital murder, in violation of § 13A-5-40(a)(2), Code of Alabama 1975. The petit jury found the appellant guilty of murder. The trial judge sentenced the appellant to life imprisonment and ordered him to pay $500 to the Alabama Crime Victims' Compensation Fund.
Travis and Martha Sue Belcher were the proprietors of Belcher's Bait and Tackle Store on Highway 22 in Chilton County, Alabama. On November 18, 1983, at the end of their work day, Mrs. Belcher tallied *Page 798 
the day's receipts, as she customarily did. She placed the receipts, checks, and most of the cash in a cigar box and carried it to their mobile home, which was adjacent to the store. Mr. Belcher remained at the store until closing time.
Exactly what happened when Mrs. Belcher entered her home is unknown, but the evidence presented at trial revealed that Mrs. Belcher was attacked. Her assailant beat her on and about the head with a blunt object. She fell out of the back door of her home and apparently tried to climb the steep bank behind the mobile home. Her assailant obviously continued to pursue and beat her, for she was found lying dead on this embankment.
Beside her body, underneath her body, and underneath the edge of the mobile home were splintered pieces of wood. Lonny Harden, a firearms and toolmark coordinator with the Department of Forensic Sciences, testified that the four pieces of wood comprised "the front hand-guard of a 12-gauge shotgun most likely a Winchester." (R. 336.) A sawed-off 12-gauge shotgun was reported to have been taken from the mobile home.
Lieutenant John Perdue, an investigator with the Alabama Bureau of Investigation (ABI), was called to the scene of the crime to assist the local authorities in the investigation. Lieutenant Perdue testified that someone had cut a slit in the screen covering the window on the end of the trailer nearest the store. On the ground below the window, there was a Coke crate standing on its end. On the bed by the window inside the trailer, there were mud, dirt, and debris on the sheets. Lieutenant Perdue concluded that someone had broken into the trailer at this location.
Lieutenant Perdue also testified that there was urine in the toilet. Just inside the back door, which was across from the bathroom door, Lieutenant Perdue found Mrs. Belcher's eyeglasses. He also found small pieces of broken glass and a newspaper scattered about. Blood was splattered on the bathroom wall and floor. From this, Lieutenant Perdue concluded that Mrs. Belcher was confronted and attacked by her assailant in the bathroom.
The following day, November 19, 1983, Deputy Benny Mims (then with the Chilton County Sheriff's Department) and others canvassed the area for clues. About 100 yards from the trailer, on the roadside, Mims found a flowery-colored lady's smock, which had spots of blood on it. Mr. Belcher identified the smock as belonging to his wife. A few feet from there, in a creek which ran parallel to the highway, a member of the search group found a pair of gray athletic socks.
Regardless of the evidence collected, the police had no significant leads on this case until 1987. In March 1987, Investigator James Henderson, with the Chilton County Sheriff's Department, received the name of Ricky Cleckler (unrelated to this appellant) as a possible suspect. Ricky was serving a life imprisonment term at Kilby Prison in Montgomery, Alabama.
Henderson also received the name of this appellant, who was at that time in the Chilton County jail on misdemeanor charges. After speaking with Ricky, Henderson interviewed this appellant on March 20, 1987. The appellant stated that Ricky told him (the appellant) that he (Ricky) had killed Mrs. Belcher.
The police officers met with the appellant in Montgomery, Alabama, in April 1987. No statement was taken at that time.
On May 8, 1987, the appellant was again interviewed by Henderson and Investigator Perry Beasley with the ABI. At that time, the appellant stated that he went with Ricky to burglarize the Belchers' mobile home. The appellant claimed that he stood watch as a lookout, while Ricky broke into the trailer, through a window, by standing on a Coke crate. The appellant stated that he heard someone walking across the gravel in front of the trailer, so he knocked on the back door to warn Ricky. According to the appellant, Ricky told him to go back to the car and after a few minutes, Ricky returned to the car. The appellant stated that Ricky had a pillow case with him and was wearing gloves. The appellant explained that Ricky stated that he got into a *Page 799 
struggle with Mrs. Belcher and that Ricky thought that he had killed her.
On May 9, 1987, the appellant gave a similar statement, saying that his May 8 statement was true. He added that the pillow case which Ricky was carrying was half full. He described the pillow case as being white with flowers on it.
On May 10, 1987, the appellant spoke with Henderson again. The appellant stated that he lived in a foster home with Mr. and Mrs. J.D. Shaw in Chilton County on November 18, 1983. The appellant, however, stated that he wanted to think about "it" a little bit, got up from his seat, and left the room.
The appellant was interviewed once again on May 18, 1987. He told the officers that he did not wish to talk to them at that time.
On May 20, 1987, Warden "Red" Billingsley and Sheriff Billy Maddox of the Chilton County Sheriff's Department took the appellant to the Belchers' store. Lieutenant Perdue and Investigator Benny Mims (then with the Chilton County district attorney's office) met the trio at the store.
The appellant told the officers that he did not commit the murder. He also said that the previous stories that he had told were not true.
Lieutenant Perdue showed the appellant a photograph of the victim's body. He asked the appellant if he knew who that was. The appellant stated that that was Mrs. Belcher. Lieutenant Perdue then pointed out a brown object lying beside the victim's body and asked the appellant if he knew what that was. The appellant responded that it looked like a piece of wood off of a gun.
A few minutes later, the appellant told Maddox and Mims that Ricky killed Mrs. Belcher. He admitted to them that he was with Ricky at the time. The appellant then told them that he did not wish to speak further at that time but that he might speak with them later.
The tandem of officers then took the appellant to the Holiday Inn in Chilton County and got a room. They ordered sandwiches and relaxed a while. They then began questioning the appellant again. Mims drew two diagrams of the crime scene and asked the appellant to show him what happened. After doing this, Mims told the appellant that his rendition of the facts did not match the evidence, specifically that there was only one set of footprints.
Mims next testified that the following occurred:
"A. . . .
 "He looked up at me then and his bottom lip began to quiver a little bit, and he got a hold of the chair he was sitting in and he shook about twice. He looked down at the floor and he sat there for a second and he said, 'It was me that was inside the trailer you know that.' And then he looked back down at the floor and just didn't say anything for a minute. And I said, 'Steve, you were by yourself, weren't you?' And he said, 'Yeah, it was just me.'
"Q What happened at that point, Mr. Mims?
 "A At that point Steve just kind of got quiet and sat back and he got real teary eyed at that point. Sergeant Perdue had concluded his phone call at about that time and came back across the room to where we were at. Sheriff Maddox and I asked Steve at that time to tell us what happened that night. To give us some details about what happened that night. . . ." (R. 404-05.)
 I
The appellant contends that he did not knowingly, intelligently, and voluntarily waive his constitutional rights before giving the statements to the police officers. He argues that, based on the "totality of circumstances," the statements which were admitted into evidence at trial should have been suppressed by the trial judge.
In support of this argument, the appellant has apprised this court of the following facts and circumstances: (1) The appellant had a low intelligence quotient (I.Q.) — 68 — and had been classified as "educable mentally retarded" (EMR); (2) the appellant, *Page 800 
on three occasions, told the questioning officers that he did not wish to speak anymore at that time; (3) the appellant told the officers that he did not want to go to the crime scene, but he was taken anyway; (4) on May 20, 1987, the appellant was read his Miranda rights upon arriving at the Belchers' store, but he was not reread his Miranda rights later that evening when he and the officers began conversing again at the Holiday Inn in Clanton; (5) the appellant claimed that he took 10 or 12 Valium pills at one time while in the county jail on May 20, before he was taken to the Belchers' store and the Holiday Inn; and (6) Investigator Mims told the appellant before questioning him at the crime scene on May 20 that there was only one set of identifiable footprints, which the appellant alleges was not true.
The appellant gave a lengthy statement following his oral confession on May 20, 1987, at the Holiday Inn. This statement and its contents, however, were excluded from evidence by the trial judge because of a promise made by the questioning officers to the appellant. The trial judge found the statement to be in violation of Ex parte Weeks, 531 So.2d 643 (Ala. 1988), and ordered that it be suppressed. The appellant now claims that the other statements given by him to the police, both oral and written, should have been excluded from the trial.
When determining the admissibility of a statement given by an accused while in custody, a two-part analysis must be applied. The court must first look to see if the proper Miranda warnings were given and, then, must determine if the statement was given voluntarily. Hutchinson v. State, 516 So.2d 889, 894
(Ala.Cr.App.), cert. denied (Ala. 1987); Moore v. State,469 So.2d 1308, 1309 (Ala.Cr.App.), cert. denied (Ala. 1985);Kendrick v. State, 444 So.2d 905 (Ala.Cr.App. 1984). Furthermore, as this court stated in Hutchinson: "The determination of the voluntariness of a confession rests in the sound discretion of the trial court. Stallworth v. State,445 So.2d 998 (Ala.Cr.App. 1984); Hammins v. State, 439 So.2d 809
(Ala.Cr.App. 1983)."
 A
First, the appellant claims that, because of his low level of intellect, he was unable to read the written statements and the waiver of rights forms and, thus, could not have knowingly, intelligently, and voluntarily waived his constitutional rights. Laura Lane, a special education teacher at Henry M. Adair School, taught the appellant during 1983. Mrs. Lane testified that she last tested the appellant in September 1983. At that time, the appellant had a reading ability and a reading comprehension level equivalent to a first or second grader. Mrs. Lane stated that the appellant could read only one-syllable words. She was of the opinion that the appellant could not have understood the contents of the waiver-of-rights form. Mrs. Lane further stated that the appellant dropped out of school in the ninth grade.
The appellant was interviewed by the law enforcement officers in 1987, four years after the evaluation was done by Laura Lane. Each of the officers who testified at the trial and at the motion to suppress hearing stated that the waiver-of-rights forms were read to the appellant on each occasion. The appellant stated that he understood his rights, and, on all occasions but one, he signed the forms. According to the officers, the appellant was able to converse with them and seemed to understand his rights and the questions posed to him.
In Holloway v. State, 561 So.2d 1119 (Ala.Cr.App. 1990), this court addressed this issue. In Holloway, the appellant was classified as "trainable mentally retarded," which is one educational level below educable mentally retarded. An expert who testified on behalf of Holloway stated that he had an I.Q. of 55 and read on a kindergarten level. An expert for the State testified that Holloway had an I.Q. of 68 or 69. This court held in Holloway that the State met its legal burden of proving that the appellant had knowingly and intelligently waived hisMiranda rights, even though he had a low intellect.
Furthermore, quoting from Garrett v. State, 369 So.2d 833,836 (Ala. 1979), we stated in Holloway: *Page 801 
 " '[I]n most cases, the defendant's mental deficiency will be but one factor to be considered in the "totality of the circumstances" surrounding the confession. In some cases, however, it may be the most important or controlling factor. See e.g. Dover v. State, 227 So.2d 296 (Miss. 1969); People v. Langston, 57 Mich. App. 666, 226 N.W.2d 686
(1975). See also Redwine v. State, 258 Ala. 196, 61 So.2d 724 (1952). The importance of this factor increases with the degree of the accused's mental retardation because he must be able to understand his right to remain silent and to an attorney before he can waive them. It is a knowing and intelligent waiver that is required. Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).'"
In Garrett, the Alabama Supreme Court held that the appellant could have knowingly and intelligently waived his rights, even though he was classified as trainable mentally retarded. Seealso Singleton v. Thigpen, 847 F.2d 668 (11th Cir. 1988), cert.denied, 488 U.S. 1019, 109 S.Ct. 822, 102 L.Ed.2d 812 (1989) (low intelligence of an accused is not a bar to admission of his statement); Smith v. State, 529 So.2d 1022 (Ala.Cr.App. 1987) (defendant's functional illiteracy goes to weight and credibility of confession, not its admissibility); Cliff v.State, 518 So.2d 786 (Ala.Cr.App. 1987), cert. denied (Ala. 1988) (defendant's low mentality goes to weight and credibility, not admissibility, of confession); Whittle v.State, 518 So.2d 793 (Ala.Cr.App. 1987), cert. denied (Ala. 1988) (defendant's mental abnormality was only one factor to consider); Sasser v. State, 497 So.2d 1131 (Ala.Cr.App. 1986) (accused with an I.Q. of 65 could knowingly, intelligently, and voluntarily confess).
Therefore, the trial judge's finding that this appellant did knowingly, intelligently, and voluntarily waive his constitutional rights and give a statement to the police was not erroneous.
 B
Statements were taken from this appellant on March 30, May 8, and May 9, 1987, at the Chilton County jail. On each occasion, the appellant waived his Miranda rights and spoke freely to the police.
On May 10, 1987, the appellant again said he understood his legal rights but refused to sign the waiver form. See Davis v.State, 440 So.2d 1191 (Ala.Cr.App.), cert. denied (Ala. 1983),cert. denied, 465 U.S. 1083, 104 S.Ct. 1452, 79 L.Ed.2d 770
(1984) (refusal to sign waiver form does not, in itself, prevent an intelligent waiver of rights). After giving a brief statement, the appellant indicated that he wanted "to think about it a little bit before he said any more." (R. 268.) The appellant then got up and left the room.
The appellant was again interviewed on May 18, 1987. He waived his rights but refused to talk to the police at that time, stating again that "he had to think about things." (R. 271.)
Finally, on May 20, 1987, Warden "Red" Billingsley and Sheriff Maddox took the appellant to the crime scene. Lieutenant Perdue read the appellant his Miranda rights from a standard form, and the appellant waived them. The appellant was shown photographs of the crime scene and he spoke with the officers. The appellant was placed in the sheriff's automobile with the sheriff and Investigator Mims. At that time, the appellant admitted that he was there on November 18, 1983, with Ricky Cleckler. The appellant then stated that he did not wish to say anything else at that time, "but he might later." (R. 330.)
The officers then took the appellant to the Holiday Inn at Clanton, got a room, ate some sandwiches, and relaxed for a period. After about one and one-half hours, they again began questioning the appellant. The appellant at that time further incriminated himself by the statements which he gave to the police officers.
The appellant argues that, on all three occasions, he asserted his right to remain silent. The appellant claims, however, that after each occasion the police reinterviewed him and, thus, violated his right to remain silent.
In Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321,46 L.Ed.2d 313 (1975), the appellant *Page 802 
was arrested and charged with committing two robberies. On the day he was arrested, a Detroit police officer attempted to question him about the robberies. The appellant refused to talk, and the officer immediately ceased his questions.
Approximately two hours later, a second police officer attempted to question the appellant about a murder that was unrelated to the two robberies. The appellant ultimately confessed to the murder and was charged with that crime.
Justice Stewart, writing for the majority, noted as follows:
 "Resolution of the question turns almost entirely on the interpretation of a single passage in the Miranda opinion, upon which the Michigan appellate court relied in finding a per se violation of Miranda:
 " 'Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.' 384 U.S., at 473-474 [86 S.Ct., at 1627-1628].
 "This passage states that 'the interrogation must cease' when the person in custody indicates that 'he wishes to remain silent.' It does not state under what circumstances, if any, a resumption of questioning is permissible. The passage could be literally read to mean that a person who has invoked his 'right to silence' can never again be subjected to custodial interrogation by any police officer at any time or place on any subject. Another possible construction of the passage would characterize 'any statement taken after the person invokes his privilege' as 'the product of compulsion' and would therefore mandate its exclusion from evidence, even if it were volunteered by the person in custody without any further interrogation whatever. Or the passage could be interpreted to require only the immediate cessation of questioning, and to permit a resumption of interrogation after a momentary respite.
 "It is evident that any of these possible literal interpretations would lead to absurd and unintended results. To permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of Miranda by allowing repeated rounds of questioning to undermine the will of the person being questioned. At the other extreme, a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the Miranda safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests. Clearly, therefore, neither this passage nor any other passage in the Miranda opinion can sensibly be read to create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent.
 "A reasonable and faithful interpretation of the Miranda opinion must rest on the intention of the Court in that case to adopt 'fully effective means . . . to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored. . . .' 384 U.S., at 479
[86 S.Ct., at 1630]. The critical safeguard identified in the passage at issue is a person's 'right to cut off questioning.' Id., at 474 [86 S.Ct., at 1628]. Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that *Page 803 
law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his 'right to cut off questioning' was 'scrupulously honored.'
". . . .
 "This is not a case, therefore, where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind. In contrast to such practices, the police here immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation."
Mosley, 423 U.S. at 101-07, 96 S.Ct. at 325-28 (footnotes omitted) (emphasis added).
Even though the appellant, in the present case, asserted his right to remain silent, the police were not forever barred from resuming their interrogation of him. See Mosley. This is true even where, as here, the police sought to reinterview the appellant about the same crime. See United States v. Bosby,675 F.2d 1174, 1182-83 (11th Cir. 1982). All that is required is that the police "scrupulously honor" the accused's right to remain silent and wait a reasonable time before they attempt to reinterview him or her. Mosley (two hours held to be reasonable). See also Bosby, 675 F.2d at 1182, n. 12.
In the case at bar, the police waited eight days, two days, and one and one-half hours, respectively, after each time when the appellant indicated his desire to remain silent. After each occasion, they immediately ceased questioning the appellant. On the authority of Mosley and Bosby, we hold that the police both "scrupulously honored" the appellant's requests and waited reasonable time to reinstigate their questioning.
The appellant further argues, however, that the police violated his right to remain silent because, following his third request to remain silent, the police did not readvise him of his Miranda rights.
In Hollander v. State, 418 So.2d 970, 972 (Ala.Cr.App. 1982), this court stated:
 "It is well settled that once Miranda warnings have been given and a waiver made, a failure to repeat the warnings before subsequent interrogation will not automatically preclude the admission of an inculpatory response. Fagan v. State, 412 So.2d 1282 (Ala.Crim.App. 1982); Smoot v. State, 383 So.2d 605 (Ala.Crim.App. 1980). Whether the Miranda warnings must be repeated depends on the facts of each individual case, with the lapse of time and the events which occur between interrogation being relevant factors to consider. Fagan v. State, supra; Jones v. State, 47 Ala. App. 568, 258 So.2d 910 (1972)."
See also Ballard v. Johnson, 821 F.2d 568, 571-72 (11th Cir. 1987) (only break in interrogation was to transport the appellant from one town to another in same day); Magwood v.State, 494 So.2d 124, 138 (Ala.Cr.App. 1985), aff'd,494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599,93 L.Ed.2d 599 (1986) (no substantial break between first and second interrogation); Tolbert v. State, 450 So.2d 805, 807
(Ala.Cr.App. 1984) (approximately 90 minutes between second and third interrogations).
As heretofore stated, the lapse of time following the appellant's third assertion of his right to remain silent was 90 minutes (or one and one-half hours). After this appellant asserted his legal right to remain silent, the four officers took the appellant to the Holiday Inn. They got a room, ate, and rested for a period. They then restarted their interview of the appellant without reappraising him of his Miranda rights.
In Hollander, Ballard, Magwood, and Tolbert (all cited above), the accuseds at no time asserted their right to remain silent. Comparatively, in Bosby and in Mosley, the *Page 804 
accuseds asserted their right to remain silent, but when the police sought to reinterview them, they were reinstructed on their Miranda rights.
Thus, the issue becomes whether an accused who asserts his right to remain silent must be readvised of hisMiranda rights before being reinterviewed. This court opined inSales v. State, 432 So.2d 560, 563 (Ala.Cr.App. 1983):
 "Although it is appellant's right to refuse to answer questions, it is also his right to change his mind for any reason and submit to questioning if he prefers to do so. United States v. Hodge, 487 F.2d 945 (5th Cir. 1973); Jennings v. United States, 391 F.2d 512 (5th Cir. 1968), cert. denied, 393 U.S. 868, 89 S.Ct. 154, 21 L.Ed.2d 136 (1968). Under these circumstances, however, the State maintains the burden of showing that the appellant 'knowingly and intelligently' waived his privilege against self-incrimination. Miranda, supra."
In this cause, it was the police, not the appellant, who reinstigated the contact following the appellant's assertion of his right to remain silent on May 20, 1987. Since the police did not readvise the appellant of his rights, it is this court's opinion that the State could not have proven that the appellant "'knowingly and intelligently' waived his privilege against self incrimination." Sales.
Therefore, all statements made by the appellant while at the Holiday Inn should have been suppressed at trial. It was, therefore, error on the part of the trial judge to permit these relevant statements to be admitted at trial.
 C
The appellant further claims that all of the statements he made on May 20, 1987, at the crime scene and at the Holiday Inn should have been excluded because: (1) he was taken to the crime scene after expressing his desire not to go; (2) he took 10 or 12 Valium pills before leaving the jail on May 20, 1987; and (3) Investigator Mims told him that they found only one set of footprints at the scene on November 18, 1983.
As for the first allegation, Sheriff Maddox explained to the appellant that he was being taken to the crime scene. Sheriff Maddox told the appellant that he did not have to talk to anyone and that he would take the appellant back to the county jail at any time that he wanted to return. There is no evidence that he was forced to go against his will. He could have asked to return, yet he apparently never did so. We, thus, find no merit to this contention.
Regarding his claim that he took 10 or 12 Valium pills, the appellant is likewise not due to prevail. The officers who spoke with the appellant on May 20, 1987, all stated that he seemed coherent and capable of understanding the questions which were asked of him.
The facts in the present case closely match those inWhittle v. State, 518 So.2d 793, 796 (Ala.Cr.App. 1987), cert.denied (Ala. 1988). Based on the authority of Whittle, we hold that the appellant has not shown that he was under the influence of sedatives to the degree that it rendered his statements involuntary. See also Wright v. State, 489 So.2d 701
(Ala.Cr.App. 1986); Watkins v. State, 495 So.2d 92 (Ala.Cr.App. 1986).
Finally, regarding Mims's comment to the appellant that they (the police) found only one set of footprints, we hold that the statement was not so misleading as to warrant reversal. InThomas v. State, 531 So.2d 45, 47 (Ala.Cr.App. 1988), the police told the appellant that they had tire prints from the crime scene which matched the tires from his automobile. InThomas, the court held:
 "It is not unfair or coercive to confront a suspect with evidence that suggests his guilt. See Moore v. State, 415 So.2d 1210, 1214 (Ala.Cr.App.), cert. denied, 459 U.S. 1041, 103 S.Ct. 459, 74 L.Ed.2d 610 (1982) (wherein this Court held that it was neither an unfair tactic nor legally coercive to confront a suspect with a co-defendant's confession); Barrow v. State, 494 So.2d 834, 839
(Ala.Cr.App. *Page 805 
1986) (in which the Court held that even confronting appellant with incorrect statements about evidence implicating him did not render his confession inadmissible where the misrepresentation was not reasonably calculated to lead the accused to confess falsely)."
In the cause sub judice, the police found only one clearly identifiable print and some other smudged prints. The testimony at trial indicated that all the prints were caused by a shoe with the same pattern. Thus, it was not unreasonable for the investigating officers to conclude that the crime was perpetrated by a sole actor; nor was it error for Mims to confront the appellant with this fact.
The appellant raises three other issues in his brief. We, however, pretermit consideration of the other assignments of error, as they are not likely to occur again on retrial.
Based on our findings above stated, this cause is due to be, and the same is hereby, reversed and remanded for a new trial.
REVERSED AND REMANDED.
All the Judges concur.