968 So.2d 1004 (2006)
Jeff Alexander SNOWDEN
v.
STATE of Alabama.
CR-04-0975.
Court of Criminal Appeals of Alabama.
May 26, 2006.
*1006 Grant John Scott, Andalusia, for appellant.
Troy King, atty. gen., and Audrey Jordan, asst. atty. gen., for appellee.
COBB, Judge.
In a six-count indictment, Jeff Alexander Snowden was indicted for two counts of trafficking in methamphetamine, see § 13A-12-231(11), Ala.Code 1975; two counts of first-degree unlawful manufacture of a controlled substance (methamphetamine), see § 13A-12-218, Ala.Code 1975; and two counts of unlawful possession of drug paraphernalia, see § 13A-12-260, Ala.Code 1975. Count I charged Snowden with trafficking in methamphetamine on June 26, 2002; count II charged him with first-degree unlawful manufacture of a controlled substance (methamphetamine) on June 26, 2002; count III charged him with unlawful possession of drug paraphernalia on June 26, 2002; count IV charged him with trafficking in methamphetamine on July 10, 2002; count V charged him with first-degree unlawful manufacture of a controlled substance (methamphetamine)on July 10, 2002; and count VI charged him with unlawful possession of drug paraphernalia on July 10, 2002. The jury found Snowden guilty of all charges. At the sentencing hearing, the trial court adjudged Snowden guilty of counts I, III, IV, and VI.[1] It then sentenced *1007 him, as a habitual offender, to concurrent terms of life in prison on each of the trafficking convictions. See § 13A-5-9(c)(3), Ala.Code 1975. The trial court also sentenced Snowden to consecutive terms of one year in jail on the paraphernalia convictions. Finally, it imposed a $100,000 fine pursuant to § 13A-12-231(11)b., Ala. Code 1975, for the trafficking conviction based on count I of the indictment; a $250,000 fine pursuant to § 13A-12-231(11)c., Ala.Code 1975, for the trafficking conviction based on count IV of the indictment; a $750 fine on each of the paraphernalia convictions; and a $100 assessment to be paid into the Forensic Trust Fund. The trial court did not render judgments or impose sentences on counts II or V, which charged Snowden with unlawful manufacture of a controlled substance. The court stated that it was permanently holding those counts in abeyance because unlawful manufacture of a controlled substance was a lesser-included offense of trafficking. (R. 438-39.) Snowden filed a "Motion for Judgment of Acquittal or in the Alternative for New Trial," which the trial court denied after conducting a hearing. This appeal follows
The State presented evidence indicating the following. On June 26, 2002, officers were dispatched to a mobile home, later identified as Snowden's residence, in the Pigeon Creek area of Red Level following a call that a person might have died there. When the officers arrived, a man was standing outside and pointed at the open back door of the mobile home and told them that the person was inside. One of the officers testified that, when he approached the back door, he smelled a very strong sour odor, which he later learned was associated with the production of methamphetamine. The body of Ricky Bush was inside the mobile home, but no one else was inside. Because of the potential for drugs at the scene, a drug-task-force agent was notified.
Officer Paul Dean of the Andalusia Police Department testified that he was assigned to the drug task force. He stated that, on June 26, 2002, he was called to the mobile home and observed in the mobile home numerous items that are associated with a methamphetamine laboratory and detected "the odor of a methamphetamine lab coming from the residence." (R. 175.) Officer Dean contacted other members of the drug task force to come to the scene, and he subsequently obtained a warrant to search Snowden's mobile home.
During the search of Snowden's mobile home, officers found numerous items and substances, both inside and outside the mobile home, that are associated with the manufacture of methamphetamine. Also, the State presented evidence indicating that officers found a black plastic box hidden under some pine straw at the edge of some woods behind the mobile home. Inside the box officers found a 20-ounce soft drink bottle that contained a red phosphorous extraction, a 2-liter Coke bottle that contained a bi-layered liquid, and two 20-ounce soft drink bottles that contained bi-layered liquids. Forensic testing indicated that the top layer of the bi-layered liquid in the 2-liter bottle contained methamphetamine and weighed 451.88 grams and that both layers of the bi-layered liquid in one of the 20-ounce bottles contained methamphetamine and weighed 220.01 grams. Finally, in the kitchen area of the mobile home, law-enforcement officers found a coffeepot that contained a small amount of bi-layered liquid and a light-bulb *1008 smoking device. Forensic testing showed that the bottom layer of the bi-layered liquid in the coffee pot contained methamphetamine and weighed 115.97 grams and that the light-bulb smoking device contained methamphetamine. Authorities obtained an arrest warrant for Snowden based on the evidence seized at his mobile home.
Officer Dean further testified that, on July 10, 2002, he received information that Snowden was at a residence on Stewart Street in Andalusia. Officer Dean and other officers went to that residence between 3:00 a.m. and 4:00 a.m. to arrest Snowden on the warrants. When Officer Dean went to the front door and knocked, he could see inside the residence; he saw a bi-layered liquid in a container on the kitchen counter. A man later identified as Jessie Reeves walked to the side door and allowed the officer to come inside to talk to Snowden, who was in bed. Once inside the residence, Officer Dean observed several items that are associated with a methamphetamine lab in plain view. The officers took Snowden into custody on the warrants and Officer Dean then contacted other drug-task-force members because he believed the house contained a methamphetamine lab.
Officer Mark Odom obtained a warrant to search the Stewart Street house. During the search of the house, officers found numerous items and substances that are associated with the manufacture of methamphetamine. For example, officers found containers of bi-layered liquids and cans of propane fuel. Further, on a coffee table in the living-room area, officers found a glass-tube smoking device and a single-edged razor blade on a dinner plate. Officer Dean testified that the "finished product," methamphetamine, was also on the plate. (R. 226.) He said that the items on the plate indicated that the plate had been put in some kind of heat source to evaporate water, that the finished methamphetamine had been left on the plate, and that the razor blade would have been used to scrape the finished methamphetamine into a pile for ingesting in some smoking device. Many of the items associated with making methamphetamine were located in a black bag in the living room; also located in that bag was a copy of the search warrant and the inventory from the June 26 search of Snowden's residence. Finally, forensic testing showed that the glass-tube smoking device contained methamphetamine and that the top layer of the bi-layered liquid in a one-gallon glass jar contained methamphetamine and weighed 1,055.60 grams.
Officer Dean testified that, while he and other officers were taking Snowden to a police car, Snowden asked to speak to Officer Dean. Officer Dean asked him what he wanted to talk about, and Snowden told him he wanted to talk about the death of Ricky Bush in the Pigeon Creek area. Officer Dean told Snowden that he was not working that case, but that he would contact someone at the sheriff's department for Snowden to talk with. Snowden then told Officer Dean that he would speak only to Dennis Meeks, who was then the chief deputy of the Covington County Sheriff's Department. Officer Dean telephoned Meeks at his home at approximately 4:00 a.m. on July 10, 2002, to tell him that Snowden wanted to speak with him about that case. Deputy Meeks told Officer Dean that he would be in his office the following morning and that he would speak to Snowden then.
Deputy Meeks met with Snowden later that day at a location away from the jail. Snowden told Deputy Meeks, that, on June 26, 2002, Joe Kervin was at his mobile home and had stated he wanted to purchase some pseudoephedrine pills to make *1009 methamphetamine. Snowden told Deputy Meeks that Kervin said he was going to get the money for the pills from Ricky Bush, but Bush did not have enough money to buy the number of pills needed. A woman named Pam Nolen was going to provide the rest of the money needed to buy the pills and, according to Snowden, Nolen gave him a ride to town to buy the pills. After purchasing the pills, Nolan and Snowden returned to the mobile home. Snowden told Deputy Meeks that events leading up to Ricky Bush's death then took place and everyone left the residence. Finally, Snowden told Deputy Meeks that the methamphetamine-related items recovered by law-enforcement officers at the residence were not his because, when he left the residence, he took with him everything associated with a methamphetamine lab that belonged to him.

I.
Snowden argues that the trial court erred when it admitted statements he made during a custodial interrogation without having received Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), warnings. He also argues that his statements were coerced.
We note, first, that the trial court did not allow the admission of statements made by Snowden. Rather, the trial court suppressed all of Snowden's tape-recorded statement and a majority of the untaped statement Snowden gave immediately before he gave the tape-recorded statement. Thus, much of Snowden's argument appears to relate to portions of the statements that the trial court did, in fact, suppress. We will set forth in some detail the facts surrounding the trial court's rulings regarding Snowden's statements to aid in an understanding of our analysis of this issue.
Snowden filed a pro se pleading styled "Motion to Dismiss," alleging that his due-process rights were violated when he was taken from Covington County jail and interrogated by Deputy Meeks and Officer Dean and by federal agents without having waived his Miranda rights and without his attorney being present. (C. 65.) Thereafter, defense counsel filed a motion requesting a hearing on the pro se motion and noting that the pro se filing actually constituted a motion to suppress. A hearing was held on October 23, 2003. Testimony was taken from Officer Dean and from Snowden; Deputy Meeks was not at the hearing. (R. 4-47.) Officer Dean testified that Snowden wanted to talk to him about Bush's death; that he then contacted the deputy investigating that case; and that he did not question Snowden about the drugs found at his mobile home or at Reeves's residence. Snowden testified that he made his statements only after Officer Dean and Deputy Meeks told him that if he did not do so, they would let Reeves "lay up there in a holding cell and die." (R. 36.) He said Reeves was an alcoholic and a drug addict and he believed the officers' threat, so he told them what he knew. He also testified that he told the federal agents who spoke to him when he first arrived that he wanted to see his attorney.
The trial court held that the State could not introduce in its case-in-chief any of the statements Snowden had made, but that it might be able to introduce them as impeachment evidence. (C. 148.) The State filed a motion for reconsideration, alleging that it had additional witnesses whose testimony would change the trial court's ruling. (C. 178.) The trial court then held a hearing on the State's motion.
At the second hearing, Agent Theron Jackson of the Federal Bureau of Alcohol, Tobacco, Firearms, and Explosives *1010 ("ATF") testified that in July 2002 a drug-task-force member had placed a telephone call to the Montgomery field office; the caller stated that an individual in Covington County had information regarding firearms and/or explosives. Agent Jackson and another officer drove to the Covington County drug-task-force office and met with Snowden for approximately 10 minutes on July 10, 2002. He testified that they told Snowden, "We understand you have information. Tell us what you have." (R. 55.) The officers determined that the information Snowden had was of little or no value to them. Agent Jackson testified that he did not read Snowden his Miranda rights and that the officers did not coerce him into giving a statement; Snowden did not appear to be under duress, and he did not tell Agent Jackson that he wanted to speak with a lawyer.
Dennis Meeks, Chief Deputy with the Covington County Sheriff's Department, testified that in July 2002 the death of Ricky Bush remained an open case and he was still acquiring information and attempting to learn how Bush had died. At 4:00 a.m. on July 10, 2002, Officer Dean telephoned him and told him where he was and that Jeff Snowden had information about Ricky Bush. Officer Dean also told Deputy Meeks that Snowden said he would speak only to Deputy Meeks about Bush's death. Deputy Meeks testified that, because Snowden was already in custody, he would speak with Snowden later in the morning. Deputy Meeks testified that Snowden had informed Officer Dean that he did not want to speak about this at the jail, so Deputy Meeks arranged to have Snowden brought to a county office and from there, Deputy Meeks drove Snowden to the drug-task-force office. The ATF agents were already there when he arrived with Snowden, and they spoke with Snowden first, but only for a few minutes. An agent came out and told Deputy Meeks that Snowden had no useful information.
Deputy Meeks and Officer Dean then spoke with Snowden. Deputy Meeks testified that, at that time, Snowden was not considered a defendant or a suspect in Bush's death; rather, he was a witness. They spoke to him because he had said he had information about Bush's death and because Snowden said he wanted to talk to Deputy Meeks. (R. 77-78.) Deputy Meeks said he did not make any promises or threats to Snowden. He did not read Snowden his Miranda rights. Snowden initially refused to allow the officers to audiotape his statement, but he made a statement about what he observed on the night Bush died. Deputy Meeks testified that, after Snowden gave the unrecorded statement, he then agreed to give a recorded statement. The second statement contained the same information as the unrecorded statement, Deputy Meeks said.
Deputy Meeks said that, before each statement, he told Snowden to start from the beginning and tell them what he knew about the case involving Bush. Snowden rambled and the officers let him talk and tell his story "because we were just letting him tell us what information he had." (R. 63.) During the narrative Snowden provided about Bush's death, Snowden made references to cooking methamphetamine, buying pills, and taking his methamphetamine supplies with him when he left the mobile home. Deputy Meeks acknowledged that, during the first, unrecorded, statement, he and Officer Dean might have asked a question or two about Bush's death after Snowden finished telling his version of events. (R. 70-71.) The officers did not ask Snowden about the methamphetamine lab or about drugs. They were talking only about the death of Ricky Bush.
*1011 Deputy Meeks said that, when Snowden completed his first statement to them, he told them that they had an innocent man in jail and that Jessie Reeves knew nothing about the drugs found at his residence. Deputy Meeks testified that Officer Dean telephoned the jail with this information, that Reeves was released from jail, and that when Snowden learned this information, he told the officers he would give a tape-recorded statement. (R. 68.) Snowden then repeated his statement on tape. Deputy Meeks testified that he did not bargain with Snowden or elicit a statement from him in return for Reeves's release from jail.
Officer Dean testified that he was employed by the Andalusia Police Department and that he was assigned to the drug task force. Officer Dean stated that, when he arrested Snowden at Reeves's residence, Snowden spontaneously told him that he wanted to talk to him about the events surrounding Ricky Bush's death. Officer Dean told Snowden that he would contact the investigator working the case, but Snowden said he would not talk to just anyone. When Officer Dean told him that the sheriff's department was investigating the case, Snowden told him he would speak only with Dennis Meeks. Officer Dean contacted Deputy Meeks and told him that Snowden wanted to talk about Bush's death; Deputy Meeks said he would speak with Snowden later that day. Officer Dean informed Snowden that Deputy Meeks would speak to him later. The trial court asked Officer Dean, "So the way you all left it was that he wanted to talk to Mr. Meeks and Mr. Meeks was going to do that later?" (R. 105.) Officer Dean told the court that that was accurate. He also told the court that Snowden did not indicate by words or conduct later that morning that he had changed his mind and did not want to talk to Deputy Meeks. Deputy Meeks did not meet with Snowden at the jail because Snowden had told Officer Dean that he did not want to speak about this matter at the jail and he expressed concerns about his safety if other inmates saw him talk to drug-task-force agents. Officer Dean did not question Snowden about the drugs found at the scene.
After the hearing, the trial court entered an order allowing part of Snowden's first statement into evidence. The order states, in pertinent part:
"Two statements were taken by the aforementioned officers on July 10, 2002. The first was not recorded. The second was. With respect to the unrecorded statement, so much information as the officers can definitively identify as having been received before any questions were put by them shall be allowed in evidence in the State's case in chief. In other words, such information appears to have been obtained in a lawful and constitutional manner. Whittle v. State, 518 So.2d 793 (Ala.Crim.App.1987). It shall thus be deemed admissible at trial if due foundation and predicate are then laid for receiving it.
"Otherwise, the Court's original ruling on the above matters shall stand as written."
(C. 182.)(Footnote omitted.)
At trial, the trial court admitted only the initial portions of Snowden's unrecorded statement regarding the events of June 26, 2002. The court did not allow the taperecorded statement into evidence. (R. 251.) During a hearing outside the presence of the jury, Officer Dean testified specifically about the portion of the statement Snowden made before he or Deputy Meeks asked Snowden any questions. Officer Dean testified that Snowden was not coerced into making the statement, that he was not threatened, and that he did not appear to be under the influence of alcohol *1012 when he made the statement. Officer Dean testified that, in the course of making the statement about Ricky Bush's death, Snowden told him about the plan to make methamphetamine and about taking his methamphetamine lab components with him when he and the others left his residence. (R. 292.)
To the extent Snowden argues that the trial court erred when admitting his statements because they were made while he was undergoing custodial interrogation, we note again that only the initial portion of the unrecorded statement was admitted at trial. The testimony about that portion of the statement comprises only three paragraphs of the entire transcript. (R. 292.) The entire tape-recorded statement and the portions of the unrecorded statement that Snowden made after the officers asked follow-up questions were suppressed.
"In reviewing a trial court's ruling on a motion to suppress, this Court reviews the trial court's findings of fact under an abuse-of-discretion standard of review. `When evidence is presented ore tenus to the trial court, the court's findings of fact based on that evidence are presumed to be correct,' Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994); `[w]e indulge a presumption that the trial court properly ruled on the weight and probative force of the evidence,' Bradley v. State, 494 So.2d 750, 761 (Ala.Crim.App. 1985), aff'd, 494 So.2d 772 (Ala.1986); and we make `"all the reasonable inferences and credibility choices supportive of the decision of the trial court." ' Kennedy v. State, 640 So.2d 22, 26 (Ala. Crim.App.1993), quoting Bradley, 494 So.2d at 761. `[A]ny conflicts in the testimony or credibility of witnesses during a suppression hearing is a matter for resolution by the trial court. . . . Absent a gross abuse of discretion, a trial court's resolution of [such] conflict[s] should not be reversed on appeal.' Sheely v. State, 629 So.2d 23, 29 (Ala. Crim.App.1993)."
State v. Hargett, 935 So.2d 1200, 1203 (Ala. Crim.App.2005).
Our reading of the testimony at the suppression hearings and the trial court's extended questioning of and comments to witnesses suggests that the trial court denied the motion to suppress only as to the initial portion of the unrecorded statement because the court determined that that portion of the statement was not the result of police interrogation. We agree.
The procedural safeguards of Miranda apply to persons subjected to custodial interrogation. Miranda v. Arizona, 384 U.S. at 444, 86 S.Ct. 1602. The Miranda Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. (footnote omitted). "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by [Miranda]." 384 U.S. at 478, 86 S.Ct. 1602. Snowden was in custody, but he initiated the meeting with Deputy Meeks so that he could reveal what he knew about the events leading up to the death of Ricky Bush.
"`"Miranda has never been held to apply to statements voluntarily made by defendants. If a defendant spontaneously volunteers information, either before or after being given the Miranda warnings, those statements need not be suppressed." United States v. Edwards, 885 F.2d 377, 387 (7th Cir.1989). See also Crawford v. State, 479 So.2d 1349, 1352 (Ala.Cr. App.1985) ("An unsolicited remark, not in response to any interrogation, *1013 does not fall within the Miranda rule"); United States v. Lawrence, 952 F.2d 1034, 1036 (8th Cir.[1992] ) ("The protections afforded a suspect under [Miranda] apply only when the suspect is both in custody and being interrogated. A voluntary statement made by a suspect, not in response to interrogation, is not barred by the Fifth Amendment and is admissible with or without the giving of Miranda warnings."), cert. denied, 503 U.S. 1011, 112 S.Ct. 1777, 118 L.Ed.2d 434 (1992).
"`"Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated.. . . . "
"`Miranda v. Arizona, 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). See also Britton v. State, 631 So.2d 1073, 1078 (Ala.Cr.App. 1993); Williams v. State, 601 So.2d 1062, 1072 (Ala.Cr.App.1991).'
"Worthington v. State, 652 So.2d 790, 792-93 (Ala.Cr.App.1994)."
Ex parte Clark, 728 So.2d 1126, 1132 (Ala.1998)(emphasis added).
As was the case in Ex parte Clark, Snowden initiated the conversation with Officer Dean and told him that he wanted to speak about the events leading up to Ricky Bush's death. When Officer Dean told Snowden that the sheriff's office was investigating that case, Snowden told him he would speak only to Chief Deputy Dennis Meeks. Snowden also told Officer Dean that he did not want to speak at the jail, out of fear for his safety. Deputy Meeks was contacted and agreed to speak with Snowden later that day. Snowden also told Officer Dean that he had information about explosives, so Officer Dean contacted ATF agents. Snowden was transported away from the jail and the ATF agents were waiting at the drug-task-force office to speak to him about what he knew about explosives in the area.
"[S]ince the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." Rhode Island v. Innis, 446 U.S. 291, 302, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)(footnote omitted). When Deputy Meeks met with Snowden, he was responding to Snowden's request to speak to him about Bush's death. Deputy Meeks asked Snowden only what he knew about the death. Thus, the initial narrative statement Snowden made was voluntary and was not made in response to interrogation or as a result of coercion. Therefore, the statement was not within the scope of Miranda. See also Whittle v. State, 518 So.2d 793 (Ala.Crim.App.1987)(defendant's statement to sheriff was volunteered and outside the scope of Miranda). The trial court admitted only that portion of the unrecorded statement that Snowden clearly initiated and volunteered. By suppressing the latter portion of the unrecorded statement and all of the recorded statement, after the officers had asked clarifying questions about Bush's death, the trial court clearly protected Snowden's constitutional rights.
The trial court here carefully considered the testimony given by Snowden and by the officers involved in the events leading up to Snowden's statements. The court held pretrial hearings and an extensive hearing at trial out of the presence of the *1014 jury. The trial court was in a far better position to evaluate the credibility of the witnesses and to resolve the conflicts in their testimony. We find no abuse of the trial court's discretion; the portion of Snowden's unrecorded statement was properly admitted. Snowden is not entitled to any relief on his claim.

II.
Snowden also argues that his trial counsel rendered ineffective assistance because, he says, counsel misinterpreted the trial court's final order regarding the admissibility of Snowden's statements to law-enforcement officers. Specifically, he contends that trial counsel's inability to read and understand the court's order is prima facie showing that his counsel was not functioning as counsel that is guaranteed to him by the Sixth Amendment and that counsel's performance was so deficient "that it essentially denied him the opportunity to a fair trial because his entire defensive strategy and ultimately the trial was based upon the trial counsel[']s erroneous interpretation." (Snowden's brief at 22.)
During the trial, the court heard testimony outside the jury's presence about what portion of Snowden's unrecorded statement would be allowed into evidence. (R. 249-90.) Defense counsel alleged that, based on the trial court's previous suppression orders, he had understood that the prosecutor would identify to him before trial any statements Snowden made before police questioning that she intended to introduce at trial. Defense counsel acknowledged that before trial he had received Snowden's tape-recorded statement and the transcripts of the hearings and that he was aware of the substance of the unrecorded statement, but because the prosecutor had not identified to him the portions of the untaped statement that would be offered into evidence, he had been prejudiced. Defense counsel moved for a mistrial. The prosecutor noted that defense counsel had filed a motion in limine three months before trial, requesting that all of Snowden's statements be suppressed because the State had not identified those that were made before police questioning. (C. 215.) The prosecutor stated that defense counsel's filing of the motion in limine implied that he was aware that a portion of the statement was admissible. (R. 273.) The trial court stated that the content of the statements had been furnished and that, during the trial but outside the hearing of the jury, the officer had definitively identified the portion of the statement Snowden made before any questions were asked. (R. 269.) The trial court denied the motion for a mistrial. (R. 274.)
Officer Dean again testified outside the hearing of the jury and identified the portions of the unrecorded statement that Snowden made before any clarifying questions were asked. (R. 279-81.) Defense counsel again argued that that portion of the statement should have been provided to him in discovery, and he moved again for a mistrial
"on the basis that if it was so obvious that this [portion of the statement] was going to come in and I missed it, then Mr. Snowden has ineffective assistance of counsel and is entitled to somebody who is bright enough to pick up from the hearing transcript and the orders what was going on. So I move for a mistrial on that basis."
(R. 286.)
The trial court stated that the defense had suffered no prejudice, and it denied the motion for a mistrial. Snowden raised the ineffective-assistance claim again in his motion for a new trial, again alleging that trial counsel had misinterpreted the suppression orders. (C. 287.) The trial court *1015 held two hearings on the motion for a new trial; a second hearing was held because the court wanted to hear testimony from trial counsel and from the attorney who was representing Snowden when he filed the motion to suppress. At the second hearing, trial counsel was asked if he would have tried the case differently if he had understood that a portion of the unrecorded statement would be admitted. Counsel responded, "I can't imagine that I wouldn't have done something differently, but as far as being able to pinpoint, that would be so speculative. I don't know exactly what I would have done, but I can't imagine that I would not have tried something." (R. 481.) He testified on cross-examination that he thought he would have done "something else," but admitted, "that's speculative." (R. 487-88.) On redirect examination, trial counsel again acknowledged that he did not know exactly what he would have done differently. (R. 491.)
The trial court issued a written order denying the motion for a new trial. The trial court rejected this claim and stated, in pertinent part: "[T]he Court need not determine whether or not trial counsel's performance was, in fact, deficient, because if it was, in this particular case, any such deficiency caused no actual prejudice to the defendant[.]" (C. 312.) We agree with the trial court.
To prevail on an ineffective-assistance-of-counsel claim, Snowden was required to demonstrate both that counsel's performance was deficient and that he was prejudiced by the deficient performance. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The Strickland Court described the prejudice requirement by stating: "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." 466 U.S. at 687, 104 S.Ct. 2052. The Court also stated, "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." 466 U.S. at 687, 104 S.Ct. 2052.
Although Snowden had the opportunity at trial and at the hearings on the motion for new trial to demonstrate how trial counsel's allegedly deficient performance prejudiced him, he failed to do so. Trial counsel could not identify anything that he would have done differently if he had known that a portion of Snowden's unrecorded statement was going to be admitted into evidence. Rather, he merely asserted that he would have done something differently, but acknowledged repeatedly that his answer was speculative. The trial court correctly determined that Snowden failed to establish the prejudice prong of the Strickland test. Because Snowden failed to demonstrate that he was prejudiced by his trial attorney's misinterpretation of the trial court's order, he was not entitled to relief under Strickland. The trial court correctly denied the motions seeking relief for alleged ineffective assistance of counsel. Snowden's claim on appeal likewise fails, and he is entitled to no relief in this Court.

III.
The State argues that the cause should be remanded because the trial court did not enter judgments or impose sentences on two of the jury's guilty verdicts  on Counts II and V of the indictment  charging first-degree unlawful manufacture of a controlled substance. We agree.
During the sentencing hearing, Snowden argued that first-degree unlawful manufacture of a controlled substance is a lesser-included offense of trafficking and that the *1016 jury's verdict finding him guilty of both trafficking and unlawful manufacture violated double-jeopardy principles. The State responded that the offenses of trafficking and unlawful manufacture have different elements; specifically, for first-degree unlawful manufacture, in addition to having a laboratory, other elements are required, while "[f]or trafficking all you have to do is to be in possession of a certain amount of a controlled substance. You don't have to have the laboratory equipment, or you don't have to have made it yourself." (R. 429.) The prosecutor further stated that Count II charged that a firearm was present along with the methamphetamine lab and that Count V charged that the lab was within 500 feet of a school, business, or another residence, both elements that elevate second-degree manufacture to first-degree manufacture. After considering the arguments of counsel, the trial court declined to impose judgment or sentence on the two unlawful-manufacture counts and stated:
"And analogizing to the law of burglary and  I think it's burglary and theft. It may be burglary and receiving stolen property. If you try them for both and one of them is a lesser included offense of the other, what you are supposed to do under the caselaw is just not do anything with one of them and sentence them on the other.
"So I'm just going let Count II and Count V hang. And if there is something wrong with my convictions on Counts I and Counts IV [trafficking], I will come back and look at them. But I'm just not going to enter any judgment or sentence right now on Counts II and Counts V because, you know, the lesser included offense statute speaks not only in terms of lesser included under the law but lesser included based on the facts. And I think [trial counsel] may have a pretty good argument."
(R. 438-39.)(Emphasis added.)
The State contends trafficking and unlawful manufacture are distinct offenses, and that unlawful manufacture is not a lesser-included offense of trafficking.[2] The United States Supreme Court has held that, in analyzing double jeopardy claims, "[t]he applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not. . . ." Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932).
Count I of the indictment alleged that Snowden,
"on or about to-wit: June 26, 2002, did knowingly and unlawfully sell, manufacture, deliver or bring into this State of Alabama, or was knowingly and unlawfully in actual and/or constructive possession of 500 grams or more but less than (1) kilo of methamphetamine, a controlled substance, in violation of Title 13A-12-231, of the Code of Alabama, 1975, and as last amended, against the peace and dignity of the State of Alabama."
(C. 1.) Count II of the indictment alleged that Snowden,
"on or about, to-wit: June 26, 2002, did unlawfully manufacture a controlled substance, to-wit: methamphetamine and, in conjunction with said act, did possess *1017 a firearm, to-wit: one (1) shotgun and/or a clandestine laboratory operation actually produced any amount of a specified controlled substance, to-wit: methamphetamine and/or a clandestine laboratory operation was for the production of a controlled substance listed in Schedule I or Schedule II, to-wit: methamphetamine, in violation of Title 13A-12-218 of the Code of Alabama, 1975, and as last amended against the peace and dignity of the State of Alabama."
(C. 1.)
Count IV of the indictment alleged that Snowden,
"on or about to-wit: July 10, 2002, did knowingly and unlawfully sell, manufacture, deliver or bring into the State of Alabama, or was knowingly and unlawfully in actual and/or constructive possession of one (1) kilo or more but less than ten (10) kilos of methamphetamine, a controlled substance, in violation of Title 13A-12-231, of the Code of Alabama, 1975, and as last amended, against the peace and dignity of the State of Alabama."
(C. 3.) Finally, Count V of the indictment alleged that Snowden,
"on or about, to-wit: July 10, 2002, did unlawfully manufacture a controlled substance, to-wit: methamphetamine, and, in conjunction with said act, a clandestine laboratory operation was to take place or did take place within 500 feet of a residence, place of business, church, or school, to-wit 223 Stewart Street, Andalusia, Alabama and/or a clandestine laboratory operation actually produced any amount of a specified controlled substance, to-wit: methamphetamine and/or a clandestine laboratory operation was for the production of a controlled substance listed in Schedule I or Schedule II, to-wit: methamphetamine, in violation of Title 13A-12-218 of the Code of Alabama, 1975, and as last amended against the peace and dignity of the State of Alabama."
(C. 3.)
The State presented evidence that established the elements alleged in each indictment, and the jury found Snowden guilty of each count.
A person commits the crime of trafficking in methamphetamine when he "knowingly sells, manufactures, delivers, or brings into this state, or who is knowingly in actual or constructive possession of, 28 grams or more of methamphetamine or any mixture containing methamphetamine." § 13A-12-231(11), Ala.Code 1975. A person commits the crime of first-degree unlawful manufacture of a controlled substance if he "[m]anufactures a controlled substance enumerated in Schedules I to V . . . [or] [p]ossesses precursor substances as determined in Section 20-2-181, in any amount with the intent to unlawfully manufacture a controlled substance," § 13A-12-217, and two or more of the following conditions occur in conjunction with the unlawful manufacture:
"(1) Possession of a firearm.
"(2) Use of a booby trap.
"(3) Illegal possession, transportation, or disposal of hazardous or dangerous materials or while transporting or causing to be transported materials in furtherance of a clandestine laboratory operation, there was created a substantial risk to human health or safety or a danger to the environment.
"(4) A clandestine laboratory operation was to take place or did take place within 500 feet of a residence, place of business, church, or school.
"(5) A clandestine laboratory operation actually produced any amount of a specified controlled substance.

*1018 "(6) A clandestine laboratory operation was for the production of controlled substances listed in Schedule I or Schedule II.
"(7) A person under the age of 17 was present during the manufacturing process.
§ 13A-12-218, Ala.Code 1975.
Snowden was charged in Count II with violating § 13A-12-218(a)(1), -218(a)(5), and -218(a)(6). Snowden was charged in Count V with violating § 13A-12-218(a)(4) and -218(a)(6).
The first-degree-unlawful-manufacture statute clearly requires proof of additional facts of which the trafficking statute does not require proof. The unlawful-manufacture statute requires proof of the production or processing of the controlled substance in conjunction with at least two of seven additional factors. The first-degree trafficking statute requires proof only that the person was in possession of at least 28 grams of methamphetamine or that the person sold, manufactured, delivered, or brought at least 28 grams of methamphetamine into the State.
Furthermore, the facts as alleged in the indictment supports the determination that the offenses were separate. Count II charged Snowden with the additional elements of possessing a firearm, having a clandestine lab, and actually producing an amount of methamphetamine at the clandestine lab. Count V charged Snowden with the additional elements of having a clandestine lab within 500 feet of a residence, having a clandestine lab, and producing an amount of methamphetamine at the clandestine lab.
Neither the statutory elements of trafficking in methamphetamine and the unlawful manufacture of methamphetamine nor the facts alleged in the indictment in this case support a finding that first-degree unlawful manufacture of methamphetamine is a lesser-included offense of trafficking. Therefore we find the State's argument on this issue to be well taken.
Accordingly, we must remand this case for the trial court to enter judgments in accordance with the jury's verdicts as to counts II and V of the indictment and to impose sentences. The trial court shall take all necessary action to see that the circuit clerk makes due return to this Court at the earliest possible time and within 56 days after the release of this opinion. The return to remand shall include the trial court's specific, written findings of fact.
AFFIRMED IN PART AND REMANDED WITH DIRECTIONS.[*]
McMILLAN, P.J., and SHAW and WISE, JJ., concur.
BASCHAB, J., concurs in part and dissents in part, with opinion.
BASCHAB, Judge, concurring in part and dissenting in part.
I concur with that part of the majority opinion that affirms the appellant's convictions for trafficking in methamphetamine and unlawful possession of drug paraphernalia. However, for the reasons set forth below, I dissent from the majority's decision to remand this case for the trial court to enter judgments and impose sentences with regard to Counts II and V of the indictment.
In this case, the State presented evidence that, on June 26, 2002, law enforcement officers found a coffeepot in the *1019 kitchen of the appellant's mobile home that had a bi-layered liquid that contained methamphetamine. It also presented evidence that, in a plastic box outside of the mobile home, officers found bi-layered liquids in a two-liter bottle and a twenty-ounce bottle; that each of those bi-layered liquids contained methamphetamine; and that the methamphetamine in those two bottles weighed a total of 671.89 grams. With regard to July 10, 2002, Dean testified that officers found a plate that had a razor blade, a glass smoking tube, and finished product methamphetamine on it; that those items indicated that the plate had been used to evaporate the liquid out of the methamphetamine; that the finished methamphetamine had been scraped up; and that the glass tube had been used to ingest the methamphetamine. Furthermore, officers also found a glass jug in a bag that contained a bi-layered liquid that contained 1,055.60 grams of methamphetamine.
The record on appeal does not include the parties' opening and closing arguments. During its oral charge, the trial court instructed the jury that it could convict the appellant of trafficking in methamphetamine if it determined that the appellant had manufactured or possessed the requisite amount of methamphetamine. After an off-the-record discussion, the trial court instructed the jury on unlawful possession of a controlled substance as a lesser included offense of both trafficking charges and as a lesser included offense of both unlawful manufacture of a controlled substance charges.
Based on the record before us, this court cannot determine whether the jury found the appellant guilty of trafficking because it believed that he had manufactured the entire amount of methamphetamine that law enforcement officers discovered on June 26, 2002, and the entire amount of methamphetamine that officers discovered on July 10, 2002, or whether the jury found the appellant guilty because it believed that he had manufactured only a portion of the methamphetamine discovered in each instance, but possessed the remainder of the methamphetamine discovered in each instance.
Moreover, the trial court did not make any findings of fact regarding its decision to hold Counts II and V in abeyance. Therefore, this court cannot determine whether the trial court concluded that, based on the facts of this particular case, unlawful manufacture and trafficking constituted the same offense; whether it concluded that unlawful manufacture was a lesser included offense of trafficking under the facts of this case; or whether the trial court concluded that the State did not present sufficient evidence to support a conviction for both first-degree unlawful manufacture of a controlled substance and trafficking in methamphetamine with regard to each incident. The trial court was not required to set forth its findings regarding its decision. However, based on the unique circumstances of this case, this court cannot properly review the trial court's decision to hold Counts II and V in abeyance without such findings. Accordingly, this court should remand this case to the trial court with instructions that that court make specific, written findings regarding the basis for its decision to hold Counts II and V in abeyance.
NOTES
[1] The trial court misspoke at sentencing regarding adjudicating Snowden guilty on count V. (R. 437.) The trial court on September 23, 2005, issued an order clarifying the judgment and the record, and indicating that no judgment had been entered on count V at sentencing.
[2] Although this Court has not previously had the opportunity to address this issue fully, in Brown v. State, 939 So.2d 957 (Ala.Crim.App. 2005), we affirmed Brown's convictions for trafficking in methamphetamine and unlawful manufacture of methamphetamine thus implicitly holding that unlawful manufacture is not a lesser-included offense of trafficking.
[*] Note from the reporter of decisions: On May 11, 2007, on return to remand, the Court of Criminal Appeals affirmed, without opinion.